McGowan *v.* McGowan, Appellant.

Argued November 12, 1929.

Before PORTER, P. J., TREXLER, KELLER, LINN, GAW-
THROP, CUNNINGHAM and BALDRIGE, JJ.

*William T. Connor,* and with him *John R. K. Scott,*
for appellant.—The guilty intent to desert is rebutted
where the separation is encouraged by the other
party or is by mutual consent: King v. King, 36
Pa. Superior Ct. 33; Neagley v. Neagley, 59 Pa. Su-
perior Ct. 565; Benny v. Benny, 87 Pa. Superior Ct.
318.

*Thomas S. Lanard,* and with him *Frank H. Schrenk,*
for appellee.—If the offer to resume marital relations
after a desertion is not made in good faith, the in-
jured party may decline to accept it: Gordon v.
Gordon, 208 Pa. 186; Leonard v. Leonard, 67 Pa. Su-

perior Ct. 412; Benny v. Benny, 87 Pa. Superior Ct. 318.

OPINION BY GAWTHROP, J., January 29, 1930:

An action for divorce a mensa et thoro was instituted by the appellant, Elizabeth McGowan, against her husband, William McGowan, October 29, 1920, on the ground that he had turned her out of doors on October 14, 1919. March 12, 1921, a libel in divorce was filed by the husband, charging the wife with wilful and malicious desertion on August 14, 1919. To this libel the wife filed an answer denying that she had deserted her husband August 14, 1919, or at any other time, and averring that she was forced from his house, that she had repeatedly made efforts to have him provide a home for her and live with her, and that "she now offers to return to the libellant and stands ready and willing to live with him and perform all her duties as a wife."

September 30, 1921, the court appointed a master who subsequently heard the testimony. No evidence was offered by the wife to sustain the libel filed by her. The only testimony offered by the husband in support of his charge of desertion was his own. It is undisputed that in December, 1921, when the master held the first hearing, the husband was forty-three years old and the wife was forty-one; that he was a police sergeant in the City of Philadelphia, and was married June 17, 1919, to the respondent, whom he had known for fifteen years as a friend of his family and a frequent visitor at his house. No children were born of the marriage. He had seven children by a former wife whose ages ranged from nineteen to three years. He testified that on August 14, 1919, when he left his home at eight o'clock in the morning to report for duty, his wife was there, but that when he came back at twelve o'clock noon she was gone; that he made in-

quiry for her and was informed by his children that she had left somewhere in the neighborhood of ten o'clock; that he next saw her about a year and a half later at the office of her counsel; that he continued to live in the same house for about two years; that he did not know where his wife went to live after leaving his residence; that he looked around for her, but made no specific inquiries concerning her whereabouts because he did not know anybody who knew her and was not acquainted with her friends; that he knew of no reason that she should have left him unless she might have been dissatisfied with the living conditions at his home; that he gave her substantially all the money he earned, to meet the household expenses during the seven weeks they lived together; that he received a letter from her about three months after the separation; that it was "a very nasty letter," saying that "she was glad to be out of my dirty shack where she cleaned my filth and dirt, and that I was a brute and her heart was broke; that I treated her like a brute." When he was asked by his counsel whether his wife said anything to him about leaving, he testified that about four weeks prior to the day she left he talked to her about the money and that she said, "I'll have to get out of here," and he said, "I don't want you to feel that way, but I didn't drag you in here and if you want to go there is nobody going to stop you."

On cross-examination he admitted that he never asked her to return; that he learned November 22, 1920, when a copy of the libel filed by the wife was served upon him, that she complained that he had turned her out of doors, and averred that she was living at 4742 Upland Street, Philadelphia. He admitted also that about September 24, 1920, he received a letter from her counsel asking him to call at the office of the latter in an effort to dispose of their differences without the necessity of litigation, and that

when he called there he learned for the first time where she was living, but made no effort to communicate with her or find out whether she was willing to return to him. He continued: "My door was always open, I didn't put the woman out, she knew my habits for sixteen or seventeen years ...... There was nobody stopped her from coming in, I didn't put her out." He fixed February 21, 1921, when he was ordered to pay alimony, as the time when he decided finally that he would not take her back.

The wife testified that on the morning of August 14, 1919, she cooked her husband's breakfast and then went upstairs; that he went up after her and made some complaints which started a dispute that resulted in his ordering her to get out of the house and telling her to "be out before he came home;" that he had ordered her to leave the house on two former occasions and that she was afraid of him; that she saw him on several occasions after this separation, but that they did not speak to one another; that in the fall of 1920, she wrote and mailed to him at 143 South 24th Street, a letter with her name and address on the envelope; that she wrote and mailed to him another letter from Cape May, the envelope being marked with a return address, in which she told him that she was returning to the city in September and that if she did not hear from him before that time and he did not support her or take her back she would "bring him up for support;" that she received no reply to either of these letters; that she consulted counsel in September, 1920, and on the 27th of that month again wrote her husband in her own handwriting and addressed it to the house in which he admits he was then living, with the return address 4742 Upland Street on the envelope, and deposited it in the mail box in Broad Street Station, Philadelphia, on the same day. This letter stated that she had been waiting to get word from him to come

home, that "I have been unhappy evèr since you made me go away, so if you will let me come home we will both be happy and I will make you care for me more than ever. Please write and tell me when I can come. Your loving wife, Lizzie, 4742 Upland Street." She testified that this letter never came back to her and that she had always been ready and willing to go back to live with her husband.

The master originally appointed by the court failed to file his report and December 29, 1925, his appointment was revoked by the court below and another master was appointed. The latter read and considered the transcript of the evidence which had been taken stenographically before the first master and filed a report, in which he recommended the dismissal of the husband's libel on the ground that the desertion of the wife, if any there was, did not continue for the full statutory period of two years, because a bona fide offer had been made by her to her husband to return and resume marital relations, and that the latter refused the offer. Upon the filing and consideration of exceptions to this report, the court below made an order directing that the report be returned to the master for the purpose of taking additional testimony and making a supplemental report on the ground that the court was in doubt, under the evidence adduced, as to the good faith of the wife's offer to resume marital relations with the husband. Whereupon, the master called another meeting and took the testimony of Mr. Schrenk, one of the counsel for the husband, and that of the husband himself, upon this subject. This resulted in a supplemental report by the master in which he found that the evidence taken at the last hearing contradicted the evidence previously adduced from the husband tending to establish an admission that there had been made to him, at the office of counsel for the wife, a bona fide offer to return to him within the

two year period; and that at no time was a sincere and bona fide offer made to the husband, either by the wife or anyone in her behalf, to return to the husband's domicile. He recommended that a decree of divorce be granted; and the court below concluded that there was a wilful and malicious desertion on the part of the respondent, persisted in for a period of more than two years, and that there never was a reconciliation or bona fide offer of reconciliation by the wife within the statutory period and dismissed the exceptions and granted the divorce. This appeal by the wife followed.

We are of one mind that the decree cannot be sustained. The testimony of the husband, denied and contradicted as it is by that of the wife, cannot be regarded as creating more than a doubtful balance of the evidence. It fails to make out a clear and satisfactory case on which to rest the conclusion that there was a wilful and malicious desertion by the wife, persisted in for two years. A decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out: Rommel v. Rommel, 87 Pa. Superior Ct. 511; Twaddell v. Twaddell, 95 Pa. Superior Ct. 429; Dunlap v. Dunlap, 97 Pa. Superior Ct. 405. We think the actions of the husband after the separation indicated that it was entirely agreeable to him. Even if it be conceded that the wife left the husband's home without sufficient justification or excuse and that there was an incipient desertion on her part, the only rational conclusion from the evidence is that soon after the separation the husband, and his counsel, received notice that the wife was anxious and willing for a reconciliation, and desired to return to him. In the circumstances it was his duty to afford her the opportunity to return to him. This he failed to

do. What may have been desertion in its inception, but has become a separation with mutual consent within two years, is no ground for divorce. See King v. King, 36 Pa. Superior Ct. 33; Neagley v. Neagley, 59 Pa. Superior Ct. 565. An offer to return breaks the desertion if it is made in good faith with the intention of carrying it out, if accepted: Thompson v. Thompson, 50 Pa. Superior Ct. 159. In our view the evidence not only compels the conclusion that the husband approved of and acquiesced in the separation begun by his wife, but warrants the statement in the brief of the able counsel for appellant that "the position of the appellee clearly manifested by the testimony produced is one of obdurate resistence to resumption of the former status prior to the time of separation." For these reasons we have been constrained to disagree with the conclusion of the court below.

The decree of divorce is reversed and the record is remitted with instructions to dismiss the libel, the costs to be paid by the libellant.