Hagan *v.* Hagan, Appellant.

Argued October 23, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Leonard J. Schwartz,* of *Fox, Rothschild, O'Brien & Frankel* for appellant.

*William T. Connor,* with him *John R. K. Scott,* for appellee.

OPINION BY RHODES, J., January 31, 1936:

This is an action of divorce instituted by a husband

against his wife on the grounds of (1) desertion, and (2) indignities to his person such as to render his condition intolerable and life burdensome.

The master recommended a decree on both grounds. The court below approved the report of the master and granted the divorce. The respondent appealed.

This case has been twice argued before this court. The decree of the court below was affirmed by us on a divided court. A reargument was granted, and it has accordingly been again argued and considered by the entire court.

The libellant, Edward J. Hagan, and the respondent, Teresa R. Hagan, were married on December 31, 1923, and thereafter resided in the city of Philadelphia. On the charge of desertion the testimony shows that the respondent left the libellant about July 15, 1928. The testimony discloses no satisfactory cause or reason for her leaving him. She previously left him in February, 1927, after chopping up her wedding ring and tearing up her marriage certificate. There was a resumption of marital relations, however, in the fall of that year, which continued until the final separation. She obtained a support order from the municipal court before the final separation. On May 5, 1930, libellant wrote the respondent a letter, asking her to return and live with him if she would stop her nagging and humiliating him before others. Respondent acknowledged that she received the letter; but she had a different version of its contents from that given by the libellant. She said that she immediately replied and suggested a meeting. Libellant denied that he received any reply; and the respondent, in her testimony, said that she had frequently met and talked to the libellant thereafter, but on these occasions she said nothing about it. Mrs. Mary Romeo, a witness for the libellant, testified that the respondent told her that, as soon as she got a little money, she was going to leave the libellant, that she

left him once before and was going to leave him again. Prior to the final separation, the respondent created a scene in the apartment house where they lived, because the libellant was calling upon some parties who were living in one of the other apartments. Respondent admitted this occurrence and that she thereafter left the libellant. Libellant's testimony relative to his efforts to have the respondent return, after the separation in July, 1928, was corroborated by two witnesses—Samuel Sampson, and his wife, Anna Sampson. Samuel Sampson testified that, at the request of the libellant, he spoke to the respondent and advised her that Mr. Hagan was willing to take her back, but that she refused to return. There were several such conversations between the witness and the respondent. At one of these Mrs. Sampson was present, and she testified that the respondent stated, on that occasion, that "she was independent, that she was working, making good money, and she was getting $12 a week allowance from him and why should she go back." Respondent's denials and explanations are not convincing, and we are of the opinion that the evidence clearly and satisfactorily establishes wilful and malicious desertion by the respondent, without reasonable cause, persisted in for two years. Kurniker v. Kurniker, 94 Pa. Superior Ct. 257; Hedderson v. Hedderson, 35 Pa. Superior Ct. 629; Hinchcliff v. Hinchcliff, 47 Pa. Superior Ct. 544; Leonard v. Leonard, 67 Pa. Superior Ct. 412; Halley v. Halley, 113 Pa. Superior Ct. 206, 172 A. 403.

The weight of the evidence on the charge of indignities is in favor of the libellant, notwithstanding the respondent's denials and exhaustive explanations which, in many respects, are corroborative of libellant's description of her conduct and attitude toward him. Much of the respondent's testimony is improbable, fantastic, and contradictory, and requires no detailed discussion. The credible testimony, in our opinion, shows

that the respondent assumed a contemptuous and humiliating attitude toward the libellant, and that this extended over a period of years and was manifested on many occasions. Respondent repeatedly and continuously charged libellant with improper relations with other women. Respondent admitted that she nagged the libellant for having alleged relations with other women, but stated that this was the result of his own admissions. We find no convincing grounds for her suspicion. The libellant worked at night, and, during the later years that they lived together, she would not permit him to sleep upon his return from work; and, in order to obtain some rest, he frequently was obliged to sleep on the floor in the bathroom. She called him vile names. She even annoyed his mother with her allegations. She humiliated him in the presence of his associates. On one occasion the libellant dressed for night inspection at the office where he worked. Believing that he had put on better clothes for another purpose, she went to the office, made a disturbance in the presence of the office force, insisted that he take off a new necktie and put on an old one. On this occasion she wiped her feet on him, struck him in the face with her fist, spit on him, and said that she did not propose to have him dress for the women employees of the telephone company. She accused him of suffering from a venereal disease, for which there was no foundation in fact. In a fit of jealous rage, she destroyed his personal jewelry and her own wedding ring. On another occasion she tore her wedding certificate to pieces. Every telephone call was assumed by her to be from some woman, and she so charged him. She repeatedly called the office where he was employed to ascertain whether he was at work, believing that he was not there, but out with other women. On a Sunday evening, just prior to the separation in 1928, the libellant called upon neighbors who were residents of the same apartment

house, leaving his wife to entertain a woman who was going to call that night and who was objectionable to him. The respondent came to the apartment, where there were several other guests, created a scene in the hallway, and aroused the entire apartment house. She called the owner of the apartment house, who lived two blocks away. She struck the libellant in the face and called him various vile names. The testimony does not disclose any improper conduct on the part of the libellant on this occasion. She then made a complaint to the domestic relations division of the municipal court, obtained an order, and thereafter left the libellant.

It is the contention of the appellant that there is no corroboration of the charges made by the libellant, and that, therefore, it is a case of an allegation upon his part and a denial upon her part, thus bringing about a doubtful balance of the evidence. The libellant is corroborated in many respects by his witnesses, and the respondent's own testimony tends to substantiate much of the testimony of the libellant. She admits that she called him vile names; that she accused him of running around with other women, and of being unfaithful to his marriage vows; that she nagged him "because I could not trust him"; that she "went upstairs and got a chisel and hammer and chopped the wedding ring up"; that, after destroying his jewelry and cutting up her ring, she "left him about the first part of February [1927]"; that she made the scene in the apartment a short time before the final separation; that she went down to the telephone office at night where the libellant was employed and made him take off a new necktie and put on an old one. In this connection, she testified: "I got him in the telephone booth and told him to get in the booth and change ties, he wasn't going to take advantage of my good nature. He got in the telephone booth and changed ties. There wasn't a soul passed there. I went home, and he came home later."

She further admitted that she wiped her feet on him, and that she tore up her marriage certificate. Although respondent testified that she frequently called up the libellant after their separation, and that she also saw him on many occasions, nevertheless she admits that she did not speak to him before having him brought into the domestic relations division of the municipal court for arrearage in the payments to her under the order of the court.

The evidence clearly establishes a course of conduct on the part of the respondent, expressed in indignities to his person such as to render his condition intolerable and life burdensome. Mullen v. Mullen, 115 Pa. Superior Ct. 300, 175 A. 710; Mathias v. Mathias, 114 Pa. Superior Ct. 444, 174 A. 821; Koontz v. Koontz, 97 Pa. Superior Ct. 70; Sharp v. Sharp, 106 Pa. Superior Ct. 33, 161 A. 453.

Our judgment is that the libellant's case has been established by that clear and satisfactory preponderance of the evidence required by our decisions.

Decree is affirmed.